

United States Courts
Southern District of Texas
FILED

AUG 28 2018

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Criminal No. 18 CR 502 |
| | § | |
| v. | § | |
| | § | |
| **NORTHWEST HOUSTON** | § | |
| **CARDIOLOGY, P.A.** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendant** | § | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

At all times material to this Information, unless otherwise specified:

### RELEVANT ENTITIES AND INDIVIDUAL

1. Defendant Northwest Houston Cardiology, P.A. ("**NORTHWEST**"), a Texas professional association, was a medical clinic located at 13325 Hargrave Road, Suite 100, Houston, Texas, with Compass Bank account number XXXXX7437.

2. Softspeed International, L.L.C. ("SOFTSPEED"), located 6225 FM 9290, Suite 100 Spring, Texas, was operated by Dayakar Moparty ("MOPARTY").

3. Red Oak Hospital, L.L.C. ("RED OAK HOSPITAL"), located, 17400 Red Oak Houston, Texas, was a private hospital co-owned and operated by MOPARTY with signature authority for RED OAK HOSPITAL's Regions Bank account number XXXXX6380.

4. Cleveland Imaging and Surgical Hospital, d.b.a., Doctors Diagnostic Hospital ("DOCTORS HOSPITAL"), located 1017 South Travis Street Cleveland, Texas, was a private hospital co-owned and operated by MOPARTY.

5. Spring Klein Surgical Hospital ("SPRING KLEIN"), a management services company, was co-owned and operated by MOPARTY with signature authority for SPRING KLEIN's Green Bank account number XXXXX5506.

## HEALTH CARE BENEFIT PROGRAMS

6. Blue Cross Blue Shield of Texas (BCBS), Aetna Health, Inc., ("Aetna"), and Cigna Corporation ("Cigna"), (collectively, the "health care benefit programs") are private plans and contracts, affecting commerce, under which medical benefits, items and tests are provided to individuals.

7. Individuals who receive benefits from the health care benefit programs are referred to as "beneficiaries."

8. Health care providers that provide tests to beneficiaries are able to apply for and obtain "provider numbers" from the health care benefit programs. A health care provider who is issued a provider number is able to file claims with the health care benefit programs to obtain reimbursement for goods or tests provided to beneficiaries.

9. Payments under the health care benefit programs are often made directly to a provider of goods or tests, rather than to a beneficiary. This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits the claim to the health care benefit program for payment, either directly or through a billing company.

2

10. To obtain payment from insurance carriers like BCBS, Cigna, or Aetna the provider or the provider's designee was required to submit claims to the insurance carrier that included, among other things, the following information (1) the provider's unique provider identification number, (2) the patient's name (3) the patient's diagnosis prescribed by a standardized code, (4) a description of tests rendered to the patient using standardized codes, (5) the date and location the tests were provided, and (6) the amount claimed for the payment.

11. BCBS, Aetna, and Cigna, and other health care benefit programs rely on health care providers to submit true and accurate claims for reimbursement for services provided to covered patient beneficiaries.

## COUNT 1

### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. §1349)

12. Paragraphs 1 through 10 of this Information are realleged and incorporated as though fully set forth herein.

13. From in or about May 2011, and continuing through in or about July 2013, in the Houston Division of the Southern District of Texas and elsewhere, the defendant, **NORTHWEST**, did knowingly and willfully combine, conspire, confederate and agree with other entities and persons to violate Title 18, United States Code, Section 1349, that is, to execute a scheme and artifice to defraud a health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24 (b) namely, BCBS, Cigna, Aetna and other health care programs to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and

under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and tests.

## Object of the Conspiracy

14. It was the object of the conspiracy for the conspirators, to unlawfully enrich the other by submitting, and causing to be submitted, false and fraudulent claims for reimbursement of medical diagnosis tests from an entity where claims were billed at a higher reimbursement rate.

## Manner and Means of Conspiracy

15. The manner and means by which the conspirators accomplished the object of the conspiracy included the following:

16. In or about May 2011, MOPARTY approached **NORTHWEST** with a business proposition to increase the utilization of medical equipment owned by **NORTHWEST**. The equipment was used by **NORTHWEST** to medically test patients. MOPARTY offered, in exchange for the use of **NORTHWEST**'s equipment to perform the tests, MOPARTY would significantly increase the number of patients for testing to increase total revenue and increase the amount MOPARTY would pay **NORTHWEST** pursuant to the agreement. MOPARTY requested **NORTHWEST**'s authorization to process, prepare, and submit claims for reimbursement for the medical services provided and collect payment from the health care benefit programs.

17. In or about June 2011, **NORTHWEST** accepted MOPARTY's offer and entered an agreement where medical tests were performed by **NORTHWEST** for the benefit of covered patient beneficiaries. MOPARTY, pursuant to the agreement, prepared, processed and submitted claims for reimbursement to the health care benefit programs

4

for the medial services **NORTHWEST** performed. MOPARTY used SOFTSPEED to prepare, process, and submit claims for reimbursement, as well as to collect payment from the health care benefit programs. MOPARTY directed SOFTSPEED to claim reimbursement at a much higher rate for **NORTHWEST**'s medical services.

18. From in or about May 2011, continuing through in or about July 2013, **NORTHWEST** performed various diagnostic tests providing MOPARTY with the billing information so that MOPARTY would submit the claims for reimbursement. MOPARTY fraudulently represented the tests were performed by RED OAK HOSPITAL and DOCTORS HOSPITAL to maximize the allowable paid amount.

19. Health care benefit programs made payments which were deposited in RED OAK HOSPITAL's Regions Bank account. MOPARTY moved proceeds from RED OAK HOSPITAL's Regions Bank account to SPRING KLEIN's Green Bank account.

20. From in or about June 2011, through in or about November 2013, MOPARTY, used SPRING KLEIN's Green Bank account to pay **NORTHWEST** approximately $2.5 million for performing the diagnostic tests.

<u>Overt Acts</u>

21. In furtherance of the conspiracy, and to effect the objects thereof, the defendants aided and abetted by others unknown, performed and caused to be performed, among others, the overt acts set forth herein, in the Southern District of Texas, and elsewhere,

    a. On or about June 9, 2011, **NORTHWEST** entered into an independent contractor agreement where SOFTSPEED would provide certain "equipment leasing, scheduling, collections and billing services."

    b. In or about June 2013, **NORTHWEST** performed medical tests on patient M.B. at **NORTHWEST** and RED OAK HOSPITAL was paid approximately $16,987 by

5

BCBS. M.B. had never been to RED OAK HOSPITAL and if services had been billed at **NORTHWEST** instead of RED OAK HOSPITAL, the paid amount would have been approximately $763 dollars.

c.  In or about June 2013, **NORTHWEST** performed medical tests on patient R.C. at **NORTHWEST** and RED OAK HOSPITAL was paid approximately $7,672 by BCBS. R.C. had never been to RED OAK HOSPITAL and if services had been billed at **NORTHWEST** instead of RED OAK HOSPITAL, the paid amount would have been approximately $361 dollars.

d.  In or about May 2013, **NORTHWEST** performed medical tests on patient P.R. at **NORTHWEST** and RED OAK HOSPITAL was paid approximately $9,343 by BCBS. P.R. had never been to RED OAK HOSPITAL and if services had been billed at **NORTHWEST** instead of RED OAK HOSPITAL, the paid amount would have been approximately zero dollars.

e.  In or about May 2013, **NORTHWEST** performed medical tests on patient L.R. at **NORTHWEST** and RED OAK HOSPITAL was paid approximately $8,493 by BCBS. L.R. had never been to RED OAK HOSPITAL and if services had been billed at **NORTHWEST** instead of RED OAK HOSPITAL, the paid amount would have been approximately $763 dollars.

f.  In or about June 2013, **NORTHWEST** performed medical tests on patient P.K. at **NORTHWEST** and RED OAK HOSPITAL was paid approximately $8,493 by BCBS. P.K. had never been to RED OAK HOSPITAL and if services had been billed at **NORTHWEST** instead of RED OAK HOSPITAL, the paid amount would have been approximately $763 dollars.

g.  On or about June 4, 2013, SPRING KLEIN issued check number 2744 for $22,000

deposited into **NORTHWEST's** Compass Bank account number xxxxx7437 for

medical tests performed at **NORTHWEST** that MOPARTY claimed were

performed by RED OAK HOSPITAL or DOCTORS HOSPITAL to collect a

higher re-imbursement rate.

h.  On or about June 14, 2013, SPRING KLEIN issued check numbered 2747 for

$16,000 deposited into **NORTHWEST's** Compass Bank account number

xxxxx7437 for medical tests performed at **NORTHWEST** that MOPARTY falsely

claimed were performed by RED OAK HOSPITAL or DOCTORS HOSPITAL to

collect a higher re-imbursement rate.

All in violation of Title 18, United States Code, Section 1349.


RYAN K. PATRICK
UNITED STATES ATTORNEY

TINA ANSARI
ASSISTANT UNITED STATES ATTORNEY

7